Foss et al. *v.* City of Chicago.

The defendant brings the case here upon writ of error, and alleges the verdict is not supported by the evidence.

Messrs. E. C. INGERSOLL and S. D. PUTERBAUGH, for the plaintiff in error :

The letter written by Aulger does not amount to a challenge, but is a mere expression of a willingness to accept one. 2 Arch. Crim. Pr. 236 ; *Commonwealth* v. *Tibbs*, 1 Dana, 524.

Mr. D. P. JONES, State's attorney, for the people.

---

ROBERT H. FOSS and BENJ. F. CARVER

*v.*

CITY OF CHICAGO.

SURETY — *discharge of* — *subrogation.* The treasurer of the board of sewerage commissioners of Chicago, deposited the funds of the board in the Marine Bank, with the approbation of the common council of the city. The law creating the board, which was a public act, authorized the deposit of the funds, and provided that they should be drawn out on checks duly numbered, and payable to the order

of the person for whose benefit they were intended, and briefly specifying for what purpose or account the same were drawn. The act also prohibited any officers of the board from taking or borrowing any of the funds for their own use, making such acts embezzlement. The treasurer in violation of the law, drew checks which were not numbered, payable to himself and others, or bearer, without specifying any purpose or account for which they were drawn, and upon them obtained $35,105.10 from the bank, which he appropriated to his own use. He also hypothecated with the bank forty $1,000 sewerage bonds, to secure his individual note, which were afterwards sold by the bank. The city settled with the bank and released it from all liability on account of the deposits. The treasurer was at that time a defaulter to the city for $34,732.46. In a suit brought by the city against the sureties of the treasurer on his official bond, *held* that the bank was liable to the city for the checks illegally drawn and paid; that the sureties, on payment of the treasurer's defalcation, would have been entitled to be subrogated to the claims of the city against the bank, and that the release of the bank discharged the sureties.

WRIT OF ERROR to the Superior Court of Chicago.

This was an action of debt, brought by the city of Chicago against Sylvester Lind, Robert H. Foss, Benjamin F. Carver, and Alexander H. Heald, on the official bond of Lind, as sewerage commissioner. On the trial, in October, 1862, the jury returned a verdict for the plaintiff, assessing the damages at $37,911.34, and judgment was rendered for the penalty of the bond, to be discharged on payment of the damages, a motion for a new trial having first been made and overruled. Foss and Carver, two of the sureties upon the bond, thereupon sued out their writ of error. The facts appear in the opinion of the court.

Mr. F. H. KALES for the plaintiffs in error.

Mr. B. F. AYER for the defendant in error.

Mr. JUSTICE BECKWITH delivered the opinion of the Court:

This is a suit brought by the defendant in error against Sylvester Lind, A. H. Heald, and the plaintiffs in error upon Lind's official bond to the city of Chicago for the faithful discharge of his duties as sewerage commissioner.

The act of the legislature incorporating the board of sewerage commissioners of that city, approved February 14th, 1855, provided for the election of three persons as sewerage commissioners; one for the north, south and west divisions, respectively, who were officers of the city; but for convenience in transacting business were made a separate corporation under the name and style of the board of sewerage commissioners. The law required the board to appoint one of their number to act as its treasurer; and that each commissioner, before entering upon the duties of his office, should give a bond to the city in such sum and with such surety as should be satisfactory to the common council thereof for the faithful performance of his duties. Lind was reëlected sewerage commissioner for the west division of the city on the 1st day of May, 1860, and the bond upon which the suit was brought was executed to secure the performance of his official duties from the time of his reëlection. The bond is dated May 23, 1860, and was presented to, and approved by, the common council on the 17th day of December, 1860.

Prior to May 1, 1860, Lind was treasurer of the board, and after that time continued to perform the duties of the office. By an act of the legislature, approved February 18, 1861, the board of sewerage commissioners was abolished after May 1st, 1861, and its property and funds were transferred to the board of public works. The act of 1855 provided that the funds of the board should at all times, until disposed of, be kept deposited in such place or places of deposit as should by an order of said board be directed, provided that such place or places of deposit should first be approved by the common council. As early as 1856, the board selected the Marine Bank of Chicago as a place of deposit of its funds, and reported its action to the mayor and common council. From that time deposits were made with this bank with the knowledge of the city, and it may be presumed that the common council approved of the place of deposit, although no formal approval appears upon its minutes. *Bank of United States* v. *Dandridge,* 12 Wheat. 70.

The act further provided that the funds of the board thus

held on deposit, should be drawn out upon checks or drafts, regularly numbered and payable to the order of the person or persons for whose benefit the same were intended, briefly specifying for what purpose or account the same were drawn.

And the act prohibited any of the officers of the board from directly, or indirectly receiving or appropriating any of its funds, money or property, and from taking, pledging or borrowing any of said funds or property for their own use or benefit, making such acts embezzlement. After Lind's reëlection in May, 1860, he appropriated to his own use, funds of the board amounting to $6,805.00 drawn from the American Exchange Bank, and $1,850.05, sewerage taxes collected. In further violation of the provisions of the act referred to, Lind drew checks which were not numbered, payable to himself and others, or bearer, without specifying any purpose or account for which the same were drawn, and upon which he obtained of the Marine Bank, moneys amounting to $35,105.10, which he also appropriated to his own use.

He also hypothecated with the bank forty sewerage bonds for the sum of $1000 each, to secure an individual note, discounted for his accommodation. The bonds thus hypothecated were sold in market, and the proceeds applied in payment of the note which they were pledged to secure. The entire defalcation of Lind was $83,760.15, upon which he was entitled to a credit for moneys deposited in bank to the credit of the sewerage account, and for moneys paid to the city authorities of $49,027.69, leaving a balance due from him of $34,732.46, for the recovery of which, with interest, this suit is brought.

The act referred· to, requiring the funds of the board to be kept in some place of deposit designated by it, and approved by the common council, and prescribing the manner in which funds should be drawn therefrom, was a public one; and the bank was' well aware of its provisions. It was well known that Lind was an officer of the city, whose powers and duties were prescribed by law; that the moneys deposited in the bank, in respect of the sewerage fund, were the funds of the city, to whom the bank was indebted for them; and that no officer had

authority to draw those funds without complying with the law which authorized it to be done. The officers of the bank knew that Lind had no right to draw checks against the fund, payable to himself or bearer, or to withdraw any of the fund from its place of deposit by checks not regularly numbered, or which did not specify the purposes for which they were drawn, or for whose benefit they were intended. The provisions of the act were intended for the protection of the city, as well as to direct the mode in which the business of the board of sewerage commissioners should be transacted. This is evident from the nature of the provisions. Funds to a large amount were to be received by the board, and the legislature deemed it unwise to allow them to remain in the hands of the commissioners; and therefore provided that the funds should be deposited in some safe place of deposit, to be selected by the board, with the approval of the common council, with the intention that the city should have the benefit of the responsibility of the bailee with whom its funds were deposited, as security for their safe keeping.

Any other construction of the law would render it optional with the board to keep the funds in their own possession, or to deposit them as required by its provisions. The commissioners were liable to be removed from office for failure to perform their duties in this respect. The law further designed that every person receiving moneys from the depositary, should execute a receipt for the same, specifying the purpose for which they were received. Hence, checks were required to be drawn to the *order of* the person for whose benefit they were intended, and to specify the purposes for which they were drawn, so that, in order to obtain the money upon the checks, the drawee would be obliged to indorse them, and thus, in effect, execute the receipt required.

The law required an examination of the checks drawn at least once in three months, and oftener, if the common council deemed it expedient, as a protection against frauds that might be committed by the treasurer of the board; and the manner in which checks were required to be drawn, was intended as a

safeguard for the protection of the city. The law substantially declares, that no moneys belonging to the sewerage fund shall be drawn from their place of deposit, except by check, upon which shall be indorsed the receipt of the drawee, and upon which shall be specified the purpose for which it was drawn.

The undertaking of Lind to obtain moneys which had been deposited in bank, on account of the sewerage fund, by checks not drawn in conformity to the law, was a fraud in itself; and when officers of the bank paid such checks, they parted with its money without any authority in law from the city, or its officers, and to one whom they knew was attempting to perpetrate a fraud.

Under these circumstances, we think that checks drawn in violation of the law, and known to be so, did not authorize the bank to pay funds in its hands to the holder of such checks; and notwithstanding the payment, the bank remained liable to the city for the funds which had been deposited by it.

On the 5th of August, 1861, the city were fully advised of the manner in which checks had been drawn, and the mayor and city treasurer notified the bank that such checks would not be accepted by the city as vouchers, and that the city would hold the bank responsible for all moneys which had been paid from the city funds on such improper and illegal checks; but on the 21st of August, 1862, the city, with a full knowledge of all the facts, made a settlement with the bank, and executed to it a formal release from all liability for deposits theretofore made with it. At that time Lind was liable to the city for defalcations arising after May, 1860, in the sum of $34,732.46. The bank was liable to the city in a like sum for moneys deposited and paid upon illegal checks, for the sum of $35,105.10. The sureties of Lind had the right, upon the payment of their liability to the city, to be subrogated to *its* rights against the bank; and when the city discharged the bank from all claims for money deposited, but paid out upon these illegal and improper checks, they deprived the sureties of their rights of subrogation to that extent, and thereby discharged them, so far as their right of subrogation was destroyed.

The sureties of Lind were aware of the law which required the funds of the board to be kept in some place of deposit, and it will be presumed that they entered into their obligation with reference to it, and the liability of the depositary to the city for deposits made by the board.

The discharge of the depositary deprives the sureties of one of the securities existing for their benefit at the time the bond was executed.

The judgment of the court below is reversed, and the cause remanded.

*Judgment reversed.*