THE CITY OF KEOKUK v. LOVE *et al.*

1. Principal and surety: SUBROGATION: COLLATERAL RIGHTS. The equity of sureties to subrogation extends not only to the rights of the creditor, as against the principal, but to all collateral rights of the creditor respecting the debt which the sureties pay.

2. ——— EXTENT OF SUBROGATION: SET-OF. Where the sureties, in the action of the creditor against them, plead and have allowed a set-off to part of his demand, their right of subrogation is not limited to the amount of the judgment against them for the balance, but extends to the whole amount of the creditor's claim.

3. ——— WHERE SURETIES HAVE NOT PAID DEBT. Where sureties who are claiming, in a court of equity, the right to be subrogated, have not paid the claim of the creditor, the court, in the exercise of its equitable power to declare future rights and duties, should order that the sureties be subrogated to the rights of the creditor, when they shall have paid the debt of the principal.

*Appeal from Lee District Court.*

SATURDAY, JANUARY 28.

ACTION by the city of Keokuk upon the official bond, as city treasurer, given by H. K. Love, as principal, and C. K. Peck and thirteen others, as his sureties. The sureties deny the claim of plaintiff, and rely upon certain matters by way of set-off. They also file a cross-petition in equity against the city of Keokuk and the receiver of the First National Bank of Keokuk, alleging that certain moneys received by Love, as city treasurer, were deposited in said bank and had never been withdrawn therefrom, and they ask to be subrogated to the rights of the city against the bank. The bank denied the claim and the right. The cause was transferred to equity, and, on final hearing, the plaintiff had judgment for the amount claimed less the set-off; but the sureties were denied subrogation. From this latter, having paid the judgment, they appeal.

*H. Scott Howell, Gilmore & Anderson* and *McCrary, Miller & McCrary* for the appellant.

*R. P. Lowe* for the appellee.

Cole, J. — I. The sureties claim that the First National Bank of Keokuk was indebted to their principal, H. K. Love, as city treasurer; this is denied by the bank. As the whole right of subrogation, as sought, is and must be grounded upon the correctness of this claim, we first turn our attention to this question of fact.

H. K. Love was a large stockholder in, and was the president of, the bank and kept his office in it. He deposited in the bank all the money of the city which came to his hands as treasurer, and the same was invariably entered in the accounts and books of the bank to the credit of the " city treasurer," with whom two accounts were kept, one called the " general account " and the other the " wharf fund." The money, pursuant to an understanding, was always drawn out on the city warrants or orders in the usual form of such instruments, signed by the clerk and mayor; and without such order or warrant, no person in the bank had any authority to pay out money on account of the city. These warrants were paid, filed, preserved and charged up to the city, like ordinary checks to individual customers of the bank. No money of this account was checked out by Love himself, nor had any other person a right to check the same.

There was also on the books of the bank an account with H. K. Love & Co., of which firm H. K. Love was the sole member. This account was largely overdrawn. But there were credits in it of the following items, among others : Feb. 6, 1867, city interest H. K. L. $8,000 ; March 30, city treasurer, $12,000 ; June 29, city treasurer, $10,-000 ; September 20, city treasurer, $6,000 ; September 20, wharf fund, $2,100.  And these sums at their re-

spective dates were charged in the city treasurer's account in this way: "March 30, 1867, H. K. L. $12,000," and so of each item. None of these were ever credited to the "city treasurer," except $4,500 of first item, city interest, which was done October 4, 1867. It is shown by the book-keeper who made these entries that the only authority therefor was what he calls the cashier's "memorandum checks," which were made by the cashier taking a blank check and writing in pencil the amount he wished charged, and on the blank line for the signer's name he would write "charge city treasurer."

The sole question of fact for us to determine is, whether these entries are to stand as valid and authoritative debits to the city treasurer's accounts. If they are to stand then the sureties do not claim any subrogation. If they are not to so stand then the bank is upon its own books and accounts indebted to the city treasurer in an amount greater than the sureties' claim in case they shall be allowed their subrogation.

We find upon the evidence before us, which is condensed and substantially set out above, that the items of debit were put in the account of the city treasurer without any authority therefor, and that the same should be stricken therefrom, so that the account between the bank and the city treasurer shall stand the same as if said items of debit (except $4,500 of the first) were omitted. In our view the entries were merely colorable and made immediately preceding the times for the bank officers to make their verified quarterly reports, and, doubtless, for the purpose of showing less overdraft and less advances or loans to its own officers. That they were made without any authority to make them, and that no money was drawn by Love from the bank on account of them or on the strength of the city deposits, is directly and satisfactorily proven. It is testified by Love that when he was first elected city treasurer in April, 1865, he was requested by the mayor and clerk

to keep the account in such manner as to show but little balance on hand as his predecessor had done, because the city was in debt, and suits were pending, and they had fears that the funds, if known, would be garnisheed, etc.; that he did keep the accounts in the account and name of H. K. Love & Co. for about one year, but finding it troublesome and unsatisfactory, accounts were opened with the city treasurer, as above stated. Counsel for appellee in argument refers to this testimony to sustain his view that the above entries were authorized. But the positive statements of the witness negative any such theory. Perhaps it should be further stated, as facts connected with the whole case, that the cashier died, the bank failed, and Love went into bankruptcy early in the year 1868.

II. It being thus determined that the debits placed in the accounts of the city treasurer shall be stricken there-

1. PRINCIPAL AND SURETY: subrogation: collateral rights.

from, it will leave a balance on the books of the bank in favor of the city treasurer in excess of the amount claimed by the sureties. But it will also have the effect to strike the corresponding credit from the account of H. K. Love & Co., and leave a balance due from him to the bank largely in excess of the amount due from the bank to the city treasurer. And, in determining the right of the sureties to subrogation, the first question arising is, whether the city, as against the bank, would have a right in equity to the balance due from the bank to the city treasurer? Why not? That account represents the funds of the city placed in the bank for its own benefit. It is true they were placed there by its treasurer, and he might have deposited them in his own name and mingled them with his own funds; if he had done so they could not be separated and identified, and hence could not, doubtless, be reached. But he did not mingle the city's funds with his own; he kept the same separate as a trust fund, to be paid out only on the orders or warrants of the city, and this was known to the officers of the bank,

who received the same with that understanding. There is then no difficulty in ascertaining the beneficiary, nor the precise trust and the money belonging to it. We can see no possible reason why the city should not have its own. The fact that the treasurer has overdrawn his individual account cannot affect the right of the city to its own funds, especially in view of the positive testimony in this case that the treasurer did not so overdraw his account on the strength of the deposit of the city funds in the same bank.

Having thus ascertained that the city, as against the bank, might reach the money thus on deposit to the credit of the city treasurer, the next question is, whether the sureties, who have paid to the city the amount thus deposited, have a right in equity to be subrogated to the claim of the city for the deposit or trust fund? And here the counsel for the appellee, the receiver of the bank, asserts, as a legal proposition, that the sureties can only be "subrogated to the rights of the creditor as against the principal." We do not so understand the rule, and, indeed, think it would be a reproach to courts of equity if their power of effectuating justice in such cases was thus limited. The equity of sureties to subrogation extends, not only to the rights of the creditor as against the principal, but to all rights of the creditor respecting the debt which the sureties pay. *Braught* v. *Griffith*, 16 Iowa, 26, and authorities cited.

III. The testimony in this case discloses the fact that the sureties, at the time the city commenced this action, held 3. —— extent of certain bonds of the city, and other claims subrogation: set-off. against it, amounting approximately to $23,000, which they used as set-offs to plaintiff's demand, leaving only between $3,000 and $4,000 for them to pay under the judgment against them, and it is now claimed that in any event their right of subrogation would be limited to this sum. In our view, such is not the law. If the sureties pay the creditor in his own obligations instead of

money, either before or after judgment, it is as well and entitles them to the same rights of indemnity, as if paid in money after judgment.

IV. It is further claimed by the appellee's counsel that the right of subrogation cannot exist until the sureties have 4. ——where paid off the obligation of their principal; that sureties have not paid debt. such payment was not made when the judgment in this case was rendered, and hence they had *then* no right to be subrogated, and their subsequent payment could give them no claim for a reversal in this court, which must review the case tried below, and not decide a *new* case. All this is answered by the single proposition, that the power of a court of equity is not limited to settling the rights of parties upon what has been done in the past, but it reaches forth and declares their duties and rights for the future; and, in the exercise of this latter power, it should have decreed that when the sureties paid the debt of their principal they should be subrogated to the rights of the creditor.

In conclusion we need only remark, that, whether the case is treated in this court as triable by the first method or the second, we reach the same conclusion upon the evidence.

The sureties ask that the final judgment be rendered in this court; and they voluntarily here state that the bonds of the city and the claims against it used by them in their defense of set-off, and in payment of the judgment, were purchased by them at about 25 per cent of their face or par value, and that they only ask such a judgment in this court as will indemnify them for the actual expenditure in the discharge of their liability. They submit a statement showing such expenditure, and the judgment will be accordingly

Reversed.