# John H. Whitbeck et al. v. Estate of R. N. Ramsay.

1. CONTRACTS—*Based upon one Lawful, and one Unlawful Consideration.*—Where a party makes two independent promises based upon one lawful consideration, one of which promises is lawful and the other unlawful, the contract itself is enforcible as to the valid promise.

2. SAME—*The Rule Stated by Coke, the Reporter.*—If any part of a contract, void at common law, be mixed up with good matter which is entirely independent of it, the good part stands and the rest is void. (Pigot's case, 6 Coke, Rep. 49.)

3. SAME—*The Test, etc.*—The test in such cases is whether the demand can be enforced without the aid of the illegal transaction.

4. SURETIES—*Reimbursement—Joint and Several Actions.*—When each surety furnishes money to pay the debt of the principal, the action to recover the same must be separate and not joint; but if the debt is paid by an agent of the sureties out of his own funds on the joint credit of the sureties, the action by the sureties must be joint.

5. STATE TREASURER—*Is a Trustee—Subrogation in Favor of Sureties of.*—The State treasurer, as custodian of the public moneys, acts in a fiduciary capacity and is a trustee. The public money in his hands is trust money, and technically held in trust. In the administration of his estate, the State will be entitled to have the right to the benefit of the classification provided by law in such cases, and his sureties having paid the same into the public treasury as such, would have the same right as the State, had it proved its claim in the County Court.

6. SUBROGATION—*Rights of Sureties.*—Sureties who pay the debt of their principal are entitled to stand in the place of the creditors or to be subrogated to all their rights as to any fund, lien or equity which such principal may have against any other person or property on account of the debt, the equities of sureties extend to all the rights of the creditors respecting the debt which the sureties pay.

**Claim in Probate.**—Appeal from the Circuit Court of Clinton County; the Hon. GEORGE W. WALL, Judge, presiding. Heard in this court at the August term, 1896. Reversed and remanded. Opinion filed March 3, 1897. Rehearing allowed and original opinion adhered to, Mr. Presiding Justice CREIGHTON, dissenting.

## STATEMENT OF THE CASE.

The claim, as stated in the court below, is predicated upon the payment by the claimants to the State of Illinois of a sum required to meet the deficit of said Ramsay as State treasurer, the claimants being the sureties on his official bond. He died during his official term, and an

examination of the treasury, immediately after his death, disclosed a deficit in cash amounting to $478,539.52.

This sum was represented by the following items, which were found among the papers of the office:

| | |
|---|---|
| Promissory notes of sundry persons....... | $113,500.00 |
| Lima Lake Bonds........................ | 1,500.00 |
| Promissory notes of Henry Seiter and Seiter & Baker..........................: | 243,778.52 |
| Promissory notes of The Napa Land Co.... | 4,400.00 |
| Receipts of said R. N. Ramsay........... | 115,361.00 |

Total................... $478,539.52

The claimants promptly paid this amount to the State and took charge of the notes, bonds and receipts.

Of these items they collected the two first, aggregating $115,000, leaving as the basis of their claim which was allowed in full in the County Court the sum of

| | |
|---|---|
| The Seiter and Seiter & Baker notes...... | $243,778.52 |
| The Napa Land Co. notes................ | 4,400.00 |
| The Ramsay receipts.................... | 115,361.00 |

Total................... $363,539.52

With the Seiter & Baker notes there were certain collaterals which claimants also received and in respect whereof they have, since the filing of the claim, made arrangements with other creditors of Seiter and Seiter & Baker, by which they are to receive an agreed amount in full, and it is conceded that this item of $243,778.52 is ultimately to be deducted from the claim, but claimants insist they are entitled to share in the dividends of the estate upon the basis of the amount due when the claim was presented until such dividends plus what is realized from the collaterals shall equal the full amount of the claim. They also insist that the claim shall be placed in the sixth class because the deficit which they have made good was of a trust fund, and therefore they are entitled to be subrogated to all the rights of the State and thus obtain precedence of the general creditors of the estate whose claims are of the seventh class.

Another contention of the claimants as to the disposition of certain sums which it is argued should be credited on the claim, amounting to about $11,000, need not be more specifically referred to now.

The estate and the general creditors contest the claim as to the amount and the classification thereof in any event, and the latter especially urge the point that by reason of an unlawful consideration moving to the claimants for becoming sureties upon the bond the whole transaction, as between the principal and the sureties, was vitiated, and that in consequence the claimants have no rights in the premises which the law will recognize and enforce. As this point is fundamental and if well taken, fatal to the claim, it will be first considered.

The unlawful matter alleged is that the claimants, ten in number, representing, and in the interest of five banks of the city of Chicago, became sureties upon the official bond of the treasurer, with and because of an agreement that the treasurer should loan to said banks a large amount of the State funds, upon which the banks were to allow and pay him interest at the rate of two and a half per cent per annum on monthly balances, and that pursuant to such agreement the sum of over one million five hundred thousand dollars of the public money was loaned to said banks very soon after the treasury passed into the hands of said Ramsay; that while the amount was reduced from time to time, large and about "equal sums constantly remained in said banks until Ramsay's death, and that the stipulated interest was regularly paid to him according to said agreement."

R. C. LAMBE, R. L. TATHAM and HOYNE, FOLLANSBEE & O'CONNOR, attorneys for appellants.

The deficit was not made good by strangers to the transaction, but by the cashier of the Chicago National Bank while acting as the agent and in behalf of Mr. Ramsay's bondsmen.

It is contended on behalf of the unpreferred creditors, that the payment of the deficit by the cashier's check of

the Chicago National Bank was a payment made by a third person, and not by the sureties themselves, and that the indebtedness having been paid by such bank, no claim now exists in favor of the sureties on the bond.

In favor of this position, the following cases are cited: White v. Cannon, 125 Ill. 412; Hough v. Ætna Life Ins. Co., 57 Ill. 318; Small v. Stagg, 95 Ill. 39; Pearce v. Bryant Coal Company, 121 Ill. 590.

The claims were properly filed in the joint names of all of the appellants.

There are two grounds which warrant the filing of the claim in the joint name of all of the appellants.

First. If the claim was one cognizable in a court of law, then it was properly filed as it was, because the evidence shows that the deficit was made good in the first instance by a cashier's check on the Chicago National Bank for moneys advanced by it for and on behalf of all of the bondsmen.

The rule seems to be well settled that in an action at law where the moneys are paid by the sureties in the first instance directly from their own separate funds, the suit must be brought by each separately for the amount paid by him; but if the moneys are paid by the sureties from their joint fund, or are paid primarily by an agent or other person for the sureties for their joint account, the suit should be brought in their joint names. Gould v. Gould, 8 Cowen, 168; 1 Chitty on Pleading, 8, 10; Osborne v. Harper, 5 East's Rep. 225; Appleton v. Bascom, 3 Met. 169; Ross v. Allen, 67 Ill. 317.

Second. The claim filed herein is an equitable proceeding, and not an action at law, and is, therefore, governed by the rules of equity and not by the rules which pertain to common law proceedings. Sheldon on Subrogation, Secs. 1 and 2; 24 Am. & Eng. Ency. of Law, 187, 191; Orem v. Wrightson, 51 Md. 46.

All the sureties have a direct interest in the subject-matter of this suit, and by all the rules prevailing in a court of equity should have been made parties to this proceeding,

either as complainants or defendants, and if they have been made co-complainants, even though some of them should ultimately be entitled to be paid nothing, it does not lie in the mouth of the administrator to complain. 1 Daniell's Chancery Pr. 190, 208; Hook v. Richeson, 115 Ill. 447; Orem v. Wrightson, 51 Md. 46; Skiff v. Cross, 21 Iowa, 459; City of Keokuk v. Love, 31 Iowa, 119; Fox v. Alexander, 1 Iredell's Eq. 340; Water Power Co. v. Brown, 23 Kan. 688; Prather v. Johnson, 3 Harris & Johnson (Md.), 487; German Am. Sav. Bank v. Fritz, 68 Wis. 398; Wolf v. Beaird, 123 Ill. 585.

In adjusting claims and settling estates, County Courts are invested with equity powers. Moore v. Rogers, 19 Ill. 347; Dixon v. Buell, 21 Ill. 203; Moline Water Power & Mfg. Co. v. Webster, 26 Ill. 234; Hurd v. Slaten, 43 Ill. 348; Wilson v. Kirby, 88 Ill. 566; Hales v. Holland, 92 Ill. 494; Wadsworth v. Connell, 104 Ill. 369.

The moneys in the hands of the State treasurer were moneys held in trust, so as to be allowed as claims of the sixth class against the estate of the deceased treasurer.

A fund can be said to be "held in trust for any purpose" within the meaning of the sixth clause of Sec. 70, Chap. 3, Rev. Stat., entitled "Administration," whenever the party holding the same is in possession thereof by virtue of a special, definite, technical or express trust.

Money in the hands of a person arising out of a business transaction between the two, or growing out of the failure of one party to comply with his agreement with the other to turn over or expend certain moneys in his hands in pursuance of his contract with such other person, is not money in his hands "in trust for any purpose," within the meaning of these words as used in that statute. To bring the case within that statute the trust must exist prior to the time of the occurrence out of which the breach of trust occurs.

Moneys are held in trust, within the meaning of that clause, by public officials, executors, administrators and guardians. They are not held in trust thereunder by any persons who are intrusted by others with funds to be used

in a specified way, who fail so to use them or who are guilty of a breach of their expressed or implied contract in that respect.

If the amount due and to be recovered from the party who has violated his agreement is measured by the damages, or is in the nature of damages, which the other party has sustained, then the party against whom such damages could be recovered, does not hold the funds in trust within the meaning of the statute. On the contrary, if it is the fund itself, or the property into which the proceeds thereof are gone, that the beneficiary is entitled to, then it is property received in trust, within the meaning of this statute.

From the foregoing doctrine, we find the law to be that the money held by the treasurer of the State was trust money, within the meaning of clause 6, Sec. 70, Chap. 3, R. S.

For the constitutional provisions providing for the office of State treasurer and giving the definition of an office, see Constitution of Illinois, Art. 5, Secs. 1, 24, 25.

For the statutory provisions in reference to the office of State treasurer, and his duties as therein defined, see Rev. Stat., Chap. 130, Secs. 7, 10, 16.

For the statutes of 1845, in regard to the classification of claims, which are referred to in various decisions cited, see Rev. Stat., 1845, Chap. 109, Sec. 115, paragraphs 1–3.

For the present statutes in regard to the classification of claims, see Rev. Stat., 1874, Chap. 3, Sec. 70, paragraphs 1–6.

For a decision in reference to what moneys are held in a fiduciary capacity, so as not to be discharged under the bankrupt act of 1841, see Chapman v. Forsyth, 2 Howard (U. S.), 202.

This case is cited inasmuch as the construction given the term "fiduciary capacity," in the United States courts, has been frequently referred to in the decisions of the courts of this State, and approved and adopted in construing our statutes as to what moneys are held in trust, so as to allow the claim therefor to be classified under the act of 1845 as a claim of the third class, and under the act of 1874 as a claim of the sixth class.

For a construction of our own statutes as to what moneys are held so as to be classified as claims of the third class under the act of 1845, and of the sixth class under the act of 1874, see Matteson et al. v. Kellogg et al., 15 Ill. 547; Tracey v. Hadden, 78 Ill. 30; Weer v. Gand, 88 Ill. 490; Wilson et al. v. Kirby, Exr., 88 Ill. 566; Fitzsimmons v. Cassell, 98 Ill. 332; Svanoe et al. v. Jurgens, 144 Ill. 507; Shipherd v. Furness et al., 153 Ill. 590.

For decisions in other jurisdictions construing similar phrases, and for the opinion of text writers, see Morse v. City of Lowell, 7 Metc. 152; Simpson v. Simpson, 80 N. C. 332; Crisfield v. State of Maryland, 55 Md. 192; Tinnuchi v. Smart, 54 L. J. R. P. C., 92; Heffren v. Jayne, 39 Ind. 463; Cronan v. Cotting, 104 Mass. 245; Hennequin v. Clews, 77 N. Y. 427; Lewin on Trusts, pp. 1, 16, 1021.

For definitions of an office, showing that an officer is a trustee, and that the funds in his hands are held by him in trust, see Bacon's Abridgment, Officers; Henly v. Mayor, 5 Bingham, 91; United States v. Maurice, 2 Brock (C. J. Marshall's Dec.), 96; Richardson v. Brooklyn C. & N. R. R. Co., 22 How. Pr. 368; Cooley in Southern Law Review, Vol. 3, 531.

The sureties of Mr. Ramsay, as State treasurer, are entitled to be subrogated to the rights of the State of Illinois, against his estate.

The sureties on the bond of the treasurer having been compelled to make good the deficit occasioned by reason of his defalcation, growing out of his having taken moneys belonging to the State, are entitled to be subrogated to all of the rights of the State, against the estate of such person, including its right to have said claim allowed and classified the same as the State could have done.

The sureties on a bond, who are compelled to make good a deficit thereon, are entitled to be subrogated in equity to all of the rights of the obligees against the principal on such bond, or against his estate, including the obligee's right to a preference against said principal's estate. Foss v. City of Chicago, 34 Ill. 488; Hough v. Ætna Life Ins. Co., 57 Ill.

Whitbeck v. Estate of Ramsay.

318; Jacques et al. v. Fackney et al., 64 Ill. 87; Richeson et al. v. Crawford et al., 94 Ill. 165; Beaver v. Slanker, Admr., 94 Ill. 175; Fogarty et al. v. Ream et al., 100 Ill. 366; Crawford et al. v. Richeson et al., 101 Ill. 351; Lochenmeyer et al. v. Fogarty et al., 112 Ill. 572; Hook v. Richeson et al., 115 Ill. 431; Sheldon on Subrogation, Secs. 87, 88; Dias v. Bouchaud, 3 Edw. Ch. 485; City of Keokuk v. Love et al., 31 Iowa, 119; Am. & Eng. Ency of Law, Vol. 24, 220, etc.; Regina v. Salter, 1 Hurls. & Norm. 274.

Nor does it make any difference as to the right of subrogation on the part of any of said sureties, if it appears from the evidence that they signed said bond voluntarily and without the request of Mr. Ramsay, inasmuch as the right of a surety to be subrogated, on payment of the debt, to the securities held by the creditor, does not depend upon contract, but rests upon principles of justice and equity. Mathews et al. v. Aikin, 1 Comstock (N. Y.), 595.

MR. JOHN P. WILSON, also for appellants.

Upon well settled principles it is clear that the contract of a principal with his surety to indemnify him for any payment which the latter may make to the creditor in consequence of the liability assumed, takes effect from the time when the surety became responsible for the principal; it is then the law raises the implied promise or contract for indemnity. Rice v. Southgate, 16 Gray, 142.

This case presents, then, the legal question as to whether, when a party for a lawful consideration agrees to do two things which are separable, one of which is legal and the other illegal, a suit can be maintained to enforce the doing of the legal thing. The question is not a new one in the Supreme Court of this State. The question was directly presented and decided in the case of Corcoran v. Lehigh & Franklin Coal Company, 138 Ill. 390.

" When the immediate object of an agreement is unlawful the agreement is void; when there are contained in the same instrument distinct engagements, by which a party binds himself to do certain acts, some of which are legal and some

illegal at common law, the performance of those which are legal may be enforced, though the performance of those which are illegal can not." (3 Am. and Eng. Ency. of Law, 886.) "When you can not sever the illegal from the legal part of a covenant, the contract is altogether void; but when you can sever them, whether the illegal be created by statute or common law, you may reject the bad part and retain the good." Ibid., note 1, and cases cited.

A distinction must be taken between the cases in which the consideration is illegal in part and those in which the promise founded on the consideration is illegal in part. If any part of a consideration is illegal, the whole consideration is void, because public policy will not permit a party to enforce a promise which he has obtained by an illegal act or an illegal promise, although he may have connected with this act or promise another which is legal. But if one gives a good and valid consideration, and ·thereupon another promises to do two things, one legal and the other illegal, he shall be held to do that which is legal, unless the two are so mingled and bound together that they can not be separated, in which case the whole promise is void. Parsons on Contracts, 6th Ed., Vol. 1, 457.

It is said in Metc. on Cont. 246, that "if one of two considerations of a promise be void merely, the other will support the promise; but that, if one of two considerations be unlawful, the promise is void. When, however, the illegality of a contract is in the act to be done, and not in the consideration, the law is different. If, for a legal consideration, a party undertakes to do two or more acts, and part of them are unlawful, the contract is good for so much as is lawful, and void for the residue. Whenever the unlawful part of a contract can be separated from the rest, it will be rejected, and the remainder established." In this case the purchase price was to be paid on each shipment, thirty days after it was made, and the price was affixed to each ton of coal. Hence there was no difficulty in separating the parts of the contract, and no injustice would result in so doing. Osgood v. Bauder & Co., 75 Ia. 550.

The Circuit Court, in its opinion in this case, relied upon Henderson v. Palmer, 71 Ill. 579, quoting the following extract from the opinion of the court in that case: "As a general rule, if any part of an entire consideration for a promise, or any part of an entire promise, be illegal, whether by statute or at common law, the whole contract is void. 'If a part of the consideration is illegal, the whole consideration is void, because public policy will not permit a party to enforce a promise which he has obtained by an illegal act or an illegal promise, although he may have connected with this act or promise another which is legal.' Parsons on Contracts, Vol. 1, 380."

Although there may be some illegal feature indirectly connected with a transaction involved in a suit, yet the plaintiff may recover if his cause of action is otherwise legitimate, and he can make out his case without calling to his aid the illegal agreement. The test of whether the demand can be enforced at law is whether the plaintiff requires the aid of the illegal contract to establish his case. Minnesota Lumber Co. v. Whitebreast Coal Co., 56 Ill. App. 248; Armstrong v. American Exchange Nat. Bank, 133 U. S. 433; Thomas v. Brady, 10 Pa. St. 164; Holt v. Green, 73 Pa. St. 198; Congress Spring Co. v. Knowlton, 103 U. S. 49; Welch v. Wesson, 6 Gray, 505; Mosher v. Griffin et al., 51 Ill. 184.

VAN HOOREBEKE, FORD, McGAFFIGAN, KINGSBURY, JOHN G. IRWIN and M. P. MURRAY, attorneys for appellees.

It was said: "As a general rule if any part of an entire promise be illegal, whether by statute or at common law, the whole contract is void," and then the court quote approvingly from Parsons on Contracts, Vol. 1, 380, as follows: "If a part of the consideration is illegal the whole consideration is void because public policy will not permit a party to enforce a promise which he has obtained by an illegal act or promise, although he may connect with this act or promise another act or promise which is legal." Henderson v. Palmer, 71 Ill. 583; Armstrong v. Toler, 11 Wheat. 258.

When Moll handed over a check covering the deficit, and the check was paid, that extinguished the bond. It was not kept alive by assignment for the benefit of the sureties, nor by virtue of any statute, nor was there any express agreement between the sureties and the State, or between them and the legal or personal representatives of Ramsay that it should thereafter be considered as the unsatisfied obligation of the principal. The bond itself was not a collateral put up by the principal or for the principal to be held by or for the sureties as an indemnity against their liability upon it, or as an additional security to the State in the nature of a collateral. Under these circumstances there was simply nothing upon which equity or the law could operate by way of subrogation. Story's Eq. Jur., Vol. 1, Secs. 499, b, c, d; Copis v. Middleton, 1 Turn. & Russ. 224, note; Hothan v. Stone, 1 Turn. & Russ. 226, note; Wright v. Morley, 11 Ves. 22; Powell's Executors v. White, 11 Leigh (Va.), 309; Jones v. Davids, 4 Russ. 277; Hodgson v. Shaw, 3 Mylne & Keen, 185.

Equity has two familiar maxims. One is that equality is equity; the other that equity follows the law. We were once perplexed in a case to reconcile these two maxims, or to decide which to follow, but found the solution of the difficulty in the distinction between legal and equitable assets. When administering equitable assets equity acts upon the maxim that equality is equity, but when administering legal assets it follows the law. It is held that all assets which accrue to an administrator by virtue of his office are legal assets, and those which can be made available to creditors only by the aid of a court of equity are equitable assets. The following cases illustrate this doctrine: First Nat. Bank v. Gage, 93 Ill. 172; Cole v. Marple, 98 Ill. 58; Am. & Eng. Enc. of Law, Vol. 1, 824.

It is familiar doctrine that when a person dies intestate his real estate descends to his heirs subject to the claims of creditors, to the extent necessary to satisfy them, after the application of all personal assets upon such claims. These also are legal assets. The rights of creditors attach

to them subject to no rights of priority except such as the statute itself gives. We find no case in Illinois where the doctrine of subrogation was ever applied as against the assets of an intestate estate. It is a fair question whether in proceedings where equity is governed by the rules of law, the doctrine of subrogation has any application, for it is certain that it is entirely unknown to the common law courts. It is a creature of equity, and has no application to an action at law. Meyer v. Mintonye, 106 Ill. 414.

Where part of an entire consideration for a promise is illegal, the whole contract is void. Henderson v. Palmer, 71 Ill. 582; Pickering v. Cease, 79 Ill. 328; Tobey v. Robinson, 99 Ill. 233; Tenney v. Foote, 95 Ill. 99; Tenney v. Foote, 4 Ill. App. 594.

Public policy will not permit a party to enforce a promise which was obtained by an illegal act or promise, although he may connect this act or promise with another which is legal. Henderson v. Palmer, 71 Ill. 582; Parsons on Contracts, Vol. 1, p. 457.

Where the immediate object or consideration of an agreement is not unlawful, but the intention of both parties at the time of the agreement is unlawful, or one party's intention is unlawful to the knowledge of the other, the agreement is void. Am. & Eng. Enc. of Law, Vol. 3, 887; Hanauer v. Doane, 12 Wall. 342.

An agreement may be void by reason of its connection with an unlawful purpose, though subsequent to the execution of it. To have this effect it must be part and parcel of one unlawful scheme. Am. & Eng. Enc. of Law, Vol. 3, 889; Armstrong v. Toler, 11 Wheat. 258.

Any security for the payment of money under an unlawful agreement is itself void, even if the giving of the security was not a part of the original agreement. Am. & Eng. Enc. of Law, Vol. 3, 889; Fisher v. Bridges, 2 E. & B. 118; Græme v. Wroughton, 11 Ex. 146; Geere v. Mare, 2 H. & C. 338; Clay v. Ray, 17 C. B. N. S. 188.

A contract may be illegal because an offense is contemplated as its ulterior result, or because it invites to the

commission of a crime. Am. & Eng. Enc. of Law, Vol. 3, 870; L. R. 5 C. P. D. 307.

An agreement to carry out some object not in itself unlawful, by means of a breach of contract or breach of trust, is unlawful and void. Am. & Eng. Enc. of Law, Vol. 3, 870; Fuller v. Dame, 18 Pick. 472; Rice v. Wood, 113 Mass. 133; Spinks v. Davis, 32 Miss. 152; Jackson v. Ludeling, 21 Wall. 616; Foote v. Emerson, 10 Vt. 338; Guernsey v. Cook, 120 Mass. 501; Noel v. Drake, 28 Kan. 265; Woodruff v. Wentworth, 133 Mass. 309; Hunter v. Nolf, 71 Penn. St. 282.

An agreement, the object of which is to induce any officer of the State to act partially or corruptly, is void. Am. & Eng. Enc. of Law, Vol. 3, 877; Lucas v. Allen, 80 Ky. 681.

Where an illegal contract is executed, courts will not aid a *particeps criminis* in setting it aside. Nellis v. Clark, 4 Hill, 424; Moseley v. Moseley, 15 N. Y. 334; Coppell v. Hall, 7 Wall. 542.

MR. PRESIDING JUSTICE SAMPLE DELIVERED THE OPINION OF THE COURT.

The court below refused to allow the claim of appellants on the ground that they signed the official bond of Ramsay as sureties because certain banks, in which the sureties were interested, were to have the use of the public money in consideration of the payment by said banks to Ramsay of two and one-half per cent interest on monthly balances. The appellants deny that there was any unlawful or corrupt agreement between them, as sureties, and Ramsay, and assert if there was an unlawful agreement between Ramsay and the banks in regard to the use of the public money, their rights are not affected thereby.

Without reviewing the evidence here, it is considered it fairly shows that the banks had an arrangement with Ramsay to secure the deposit with them of a large amount of the public funds, for which they were to pay him therefor the rate of interest stated, and that because of such arrangement said banks secured for Ramsay said sureties.

Does such a state of facts bar the sureties of their legal right to recover in this case?

The bond was in the usual official form and created, as between Ramsay and the sureties, by operation of law, an implied contract of indemnity (Pritchett et al. v. People, 1 Gilm. 525; Baylis on Sureties, 23) at the time of its execution (Id. p. 340) that the former would pay to the latter whatever sum of money they had to pay for him. Ridgeway v. Potter, 114 Ill. 457. The consideration that supported the express contract as between the State and Ramsay, supported the implied contract as between the sureties and Ramsay. This is the conceded rule of law. Am. & Eng. Ency. of Law, Vol. 24, p. 773. Those contracts, therefore, both expressed and implied, in and of themselves, as well as the considerations that supported them, were lawful. If the principal contract of the bond was lawful, which is conceded, and there was an implied contract arising therefrom by operation of law, as between Ramsay and the sureties, it must also have been lawful, for it would be illogical to hold that an unlawful contract could arise by operation of law, or that a contract could so arise upon which there could be no right of action. But at this point it is insisted that there was a superadded consideration to the already adequate and lawful consideration, as between the sureties and Ramsay, which tainted and vitiated the consideration supporting the implied contract, which unlawful consideration is said to be the agreement of Ramsay to deposit a portion of the State funds in certain banks.

This theory attempts to mingle and give two considerations to the bond itself: one, that fixed by law, viz., the attainment of the object for which the bond was given (Baylis on Sureties, p. 60); the other, as claimed, that above referred to, viz., the deposit of State funds in certain banks. Now, according to appellees' claim, two contracts were made: one with the State, as evidenced by the bond; the other between Ramsay and the banks, as evidenced by the contract to deposit the State money; and the sureties signed the bond because of the agreement of Ramsay to deposit

money in the banks. That is, the sureties agreed to make one contract with the State, having its own consideration, if Ramsay would make another separate and distinct agreement with the banks, having its own consideration, viz., the payment to him of two and one-half per cent interest on the monthly balances of such deposits. Therefore the consideration that entered into the bond itself, was not the same consideration that entered into the contract for the deposit of money, as each had its own consideration. In short, the consideration that entered into the bond was not the consideration of the unlawful contract. The fact that one contract was the inducing cause of the making of the other, does not constitute the consideration of either contract, though, as to the sureties and Ramsay, one was the motive for the other. There is a distinction between motive and consideration. Philpot v. Grúninger, 14 Wall. 570.

It will be observed in this connection that the contract to deposit the State money on the one hand and to pay interest on the other, existed between the banks and Ramsay and not between the sureties and Ramsay. There is no pretense the sureties were to pay or guarantee the payment of the interest, nor is there any evidence to induce the belief such contract would have been made to deposit money in said banks except for the agreement to pay interest thereon. The agreement to deposit money on the part of Ramsay, and the agreement to pay interest on the part of the banks were the concurrent considerations of that contract, no part of which consideration, as such, proceeded from the sureties.

But if it may be said that the promise to deposit said money in the banks was made in consideration of the execution of the bond by these sureties. Then this is the legal situation: 1. That the sureties, in the execution of the bond, did a lawful act, based on a lawful consideration. 2. In consideration of which Ramsay, by operation of law, impliedly agreed to reimburse them for any money they had to pay on account of signing said bond, and also agreed

to deposit said money in the banks. Here we have a lawful act or consideration supporting two promises on the part of Ramsay, one of which is lawful and the other unlawful, which brings the case within the rule of law that where a party makes two independent promises based upon one lawful consideration, one of which promises is lawful and the other unlawful, the contract itself is enforcible as to the valid promise. Widoe v. Webb, 20 Ohio St. 435; Doty v. Knox County Bank, 16 Ohio St. 142; Kerrison v. Cole, 8 East. Rep. 231; Parson on Contracts, Vol. 7, p. 455–6.

The rule is stated differently and a little more broadly that if any part of a contract, void by the statute or common law, be mixed up with good matter, which is entirely independent of it, the good part stands and the rest is void. See note c to Pigot's case, Vol. 6, Coke's Rep., part 11, 49, citing various authorities.

The test in such cases is whether the demand can be enforced without the aid of the illegal transaction. Holt v. Green, 73 Pa. St. 198; Swan v. Scott, 11 S. & R. 164; Thomas v. Brady, 10 Barr (Pa. St.), 164; Scott v. Duffy, 2 Harris (Pa. St.), 18; Armstrong v. American Exchange Nat. Bank, 133 U. S. 433.

The principles above announced are clearly stated in effect in Corcoran v. Lehigh & F. Coal Co., 138 Ill. 390. Ap plying such test to this case, and it is clear the sureties require no aid of the illegal transaction to establish their rights under the bond.

The point is made that each surety should have filed his claim separately.

The law is, in an action at law, that when each surety furnishes money to pay the debt of the principal, the action to recover the same must be separate and not joint. Ross v. Allen, 67 Ill. 317; Gould v. Gould, 8 Cowen, 168; 1 Chitty on Pleadings, No. 11; Appleton v. Bascom, 3 Metcalf, 169. But the same authorities hold that if the debt is paid by an agent of the sureties out of his own funds on the joint credit of the sureties, then the action by the sureties is joint.

In this case the evidence is that Mr. Blount and Moll, as

the representatives of the sureties, went to Springfield to investigate as to the deficit and to settle the same. Mr. Blount testified that he was cashier of the National Bank, and said: "I represented only part of them (the sureties); Mr. Moll represented the other part; we two represented them all. The governor informed me that there was a shortage and told me that we would be obliged to make it up. I informed the governor that it would be impossible for me to remain in Springfield on the day the transfer would be made, but that Mr. Moll, my representative, would remain there and act for all of us. And I left the check with Mr. Moll to pay the deficiency, whatever it might be. The governor made a demand on me, as representative of the bondsmen, to make good the deficiency." The check on the National Bank, which was introduced in evidence, shows payment of the deficiency. Mr. Blount further testified that afterward the sureties paid the amount of the check.

There is also other evidence which shows these payments were made good to the sureties, or at least to some of them. But this fact does not affect the legal question involved. The sureties, and not the banks, were contractually liable, and as such made good the deficit in the manner above stated.

What the banks promised to do for the sureties, or actually did for them, in the way of reimbursement, is legally immaterial. In our opinion the claims were properly presented against the estate in a joint form.

But in addition to this view, it may be said the proceeding in the Probate Court to adjust these claims was an equitable proceeding, where equitable rules apply, as has been frequently held. Hurd v. Slaten, 43 Ill. 348; Hales v. Holland, 92 Ill. 494; Wadsworth v. Connell, 104 Ill. 369. Therefore the strict rules of law, even if applicable to the facts of this case, would not be applied so as to require each surety to file separate claims.

The claimants insist the public funds in the hands of the State treasurer are a trust fund, and therefore the State

Whitbeck v. Estate of Ramsay.

would have the right to the preference provided by the sixth paragraph of Sec. 70, Chap. 3 of the statute on the classification of claims, which is as follows: " Where the decedent has received money in trust for any purpose, his executor or administrator shall pay out of his estate the amount thus received and not accounted for."

It appears to be held in Wilson et al. v. Kirby, Ex'r, 88 Ill. 566, Svanoe v. Jurgens, 144 Ill. 507, and Shipherd v. Furness, 153 Ill. 590, that a public officer, into whose keeping a public fund is intrusted, is acting in a fiduciary character, and such fund is regarded as a special trust fund by operation of law and not by implication from a contract.

If this view of those decisions is correct, have these sureties, under the doctrine of subrogation, the right to the benefit of this statute in the classification of their claims? The general rule is that sureties who pay the debt of their principal are entitled to be subrogated to the rights and remedies of the principal. Foss et al. v. City of Chicago, 34 Ill. 488.

In Richeson et al. v. Crawford et al., 94 Ill. 165, it is held the sureties on collector's bond are entitled to be subrogated to the lien given by the statute; and on page 174 the cases of Hunter v. The United States, 5 Peters, 173, and United States v. Hunter, 5 Wash. 466, are cited with approval, which hold that " the same priority which belongs to the government attaches to the claim of an individual who, as surety, has paid money to the government." True, as appellees claim, the priority was given by a legislative act to the government, but the same is true in this case as to the State, if the fund is technically a trust fund.

In Lochenmeyer et al. v. Fogarty et al., 112 Ill. 572, several cases are cited on page 583 expressive of the views of the court as to the rights of subrogation, viz., Eddy v. Traver, 6 Paige, 521: " That sureties who pay a debt are entitled to stand in the place of the creditor, or to be subrogated to all his rights as to any fund, lien or equity which he may have against any other person or property on account of the debt " (City of Keokuk v. Love, 31 Iowa, 119);

" that the equities of sureties extend to all the rights of the creditors respecting the debt which the sureties pay " (1 Leading Cases in Equity, p. 144); that "he (the surety) is considered as at once subrogated to all the rights, remedies and securities of the creditor—as substituted in the place of the creditor—and entitled to enforce all his liens, priorities and means of payment." See also Sheldon on Subrogation, Sec. 88; A. & E. Ency. of Law, Vol. 24, p. 220.

It is earnestly urged by appellees' counsel that these statements of the doctrine of subrogation—that the surety is entitled to "all the rights and remedies of the creditor"—are inaccurate; that his rights and remedies are limited to those arising out of the contract of the principal, or to collaterals or other indemnity. We understand the doctrine of subrogation to be primarily that of substitution, or the placing of the sureties in the shoes of the creditor, invested with all the rights of the creditor to secure payment. It is an equitable doctrine, founded upon natural justice, that one who pays the debt of another should be substituted for and have all the rights and remedies transferred to him that were afforded by law to the one whose debt is thus paid. "The substitute is put in all respects in place of the party to whose rights he is subrogated." Orem v. Wrightson, 51 Md. 34; Sheldon on Subrogation, Sec. 1; Am. & Eng. Ency. of Law, Vol. 24, p. 187.

This interpretation of the doctrine works no hardship, for the surety only resorts to those means of collecting his debt that were already afforded by law to the creditor.

If the fund held by the State treasurer is a special trust fund, then the State, as a creditor, under the 6th paragraph of Sec. 70, Chap. 3 of the administration act, would be entitled to the classification thereby provided. That it is such a fund, we understand our Supreme Court has in principle decided in the Wilson and other cases cited. The case of Chapman v. Forsyth, 2 How. 202, is cited and commented on in various decisions, and the language approved, which held, "The cases enumerated, 'the defalcation of a public officer,' 'executor,' 'administrator,' 'guardian' or

' trustee,' are not cases of implied but special trusts, and the ' other fiduciary capacity' mentioned must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract."

This language clearly indicates that the bankrupt act quoted was regarded as a legislative declaration of what constituted legally a technical trust, rather than, as claimed by appellee's counsel, a legislative definition or creation of technical trusts for the purposes of that act. Prior to the act of 1871–2 of our statutes, money in the hands of an executor, administrator or guardian was by the legislature, in effect, declared to be technical trusts, and that act, it is said in Wilson case, *supra*, p. 569–570, " by the use of the phrase 'in trust for any purpose,' intended to extend the class of preferred claims, but how far admits of question; " and then follows in the decision a definition of the word " trusts," in a broad sense, from Perry on Trusts, and the declaration of what is a technical trust, within the meaning of the act of 1871–2, as held in the Chapman case, the language of which is above quoted.

Certainly the State treasurer, as the custodian of the public money, is acting in a fiduciary capacity, and is as clearly a trustee as an administrator or guardian, and concededly, money in the hands of either the guardian or administrator would be trust money. Therefore, our conclusion is that the public money in the custody of the State treasurer was money technically held in trust, and as the State would have had the right to the benefit of the classification provided by law in such cases, so, in this equitable proceeding, the sureties have the same rights as the State would have had in case it had proved its claim.

As to the sum of $11,591.11, made up of interest on deposits and uncollected salary of the deceased treasurer, which by appellees it is contended should be deducted from the aggregate claims filed, and by appellants contended that only the residue after deducting some $8,000 for expenses should be credited, we hold that all moneys in the hands or under the control of the sureties belonging to the

estate of the deceased should be deducted, without any allowance for expenses taken therefrom. The expenses mentioned, relating principally to the adjustment and settlement of the Seiter collaterals, are assumed to have been taken into consideration in making that settlement. Those expenses should not be charged to the estate in this proceeding.

As to the $15,000 paid to Mr. Blount, a representative of the sureties, by the First National Bank of Springfield, on the 16th day of November, 1894, it does not appear to have been accounted for, though it does not appear to have been a controverted matter, and is not mentioned in appellants' argument. It is not mentioned by the court below in his statement of the controverted questions, and therefore it is resubmitted to the court below for further investigation, with the statement that we are unable to discover where it is credited.

As to the $10,000 deposited in a St. Louis bank by the State treasurer shortly before his decease, and which was drawn out by his administrator and placed with the general funds of the estate, which is claimed by the appellants to be a special trust fund that they can follow and obtain, we hold that before they could do so, they must be able to identify it, or the property into which it was converted, which they have not done, within the strict rules laid down in Wetherell v. O'Brien, 140 Ill. 146; Mutual Acct. Association v. Jacobs, 141 Ill. 261; The Union Nat. Bank v. Goetz et al., 138 Ill. 127; which, as we understand, are not as broad as those laid down by the courts of Iowa, Wisconsin and New York.

As to when the Seiter collaterals of $243,778.52, with interest, which were adjusted and in effect collected, by the settlement made August 1, 1895, should be credited, we hold in the absence of any agreement to the contrary, under the authority of Levy v. Chicago Nat'l Bank, 158 Ill. 102, that as this sum was collected after the claim was filed, viz., February 1, 1895, that it does not have to be deducted prior to the judgment on the claim.

We are unable to find evidence of an agreement to credit

said amount before the hearing. On the contrary, the evidence indicates that the appellants were objecting to crediting the same except under the rule in the Levy case, as is indicated by the record at pp. 147–8.

For the reasons stated, the judgment is reversed and the cause remanded.

A rehearing was allowed in the foregoing case. After careful consideration, we adhere to the decision of our predecessors. Case reversed and remanded.

CREIGHTON, P. J., dissents.