## Estate of Rufus N. Ramsey v. John H. Whitbeck et al.

1. DEFENSES—*Involving Criminal Charges—Measure of Proof.*— Where, in a civil action, a defense is based upon criminal acts of the plaintiff, the evidence to sustain such defense must be full, clear and satisfactory.

2. RES ADJUDICATA—*Former Decisions.*—Where a case is adjudicated by this court, reversed and remanded to the Circuit Court, and when tried anew in that court, additional testimony of a material character is introduced without objection, and it comes again before the Appellate Court upon the evidence contained in the former bill of exceptions, admitted by consent of parties together with the additional testimony taken since the first hearing, such first adjudication will not be regarded as *res adjudicata* upon the questions involved.

3. STATUTES—*Rule in Construing.*—In construing statutes courts apply the meaning of words as generally used, unless it is apparent that they are used technically, and take notice of general methods of business, upon the presumption that legislators when making laws, act with reference to such meanings and methods. ·

4. DEPOSITS—*The Term Defined.*—A deposit is defined as " money lodged in a bank for safe keeping." Strictly speaking, a deposit signifies only bonds or bills, or bullion deposited with a bank at interest and not capable of being withdrawn except after certain specified notice, and refers to a deposit account as money deposited with a banker at interest for some certain specified time. It is opposed to a current account which can be added to or drawn upon at any time without notice to the banker.

5. SAME—*Banks Receiving from Officers—Becoming Sureties on Their*

Estate of Rufus N. Ramsey v. Whitbeck.

*Bonds.*—That banks receiving deposits from officers should furnish the sureties on such officers' bonds, is a natural and not an unlawful business transaction. And that they should condition their becoming sureties upon an agreement that their banks should be depositories of the funds which they secure, is equally natural and not unlawful.

6. CRIMINAL LAW—*Officers Depositing Public Funds for Interest.* —The test of criminality is not the agreement by the officer to deposit public funds for safe keeping at a place designated by his sureties from which they can be withdrawn in whole or in part at any time without notice; but is the investment or the loaning of public funds for the officer's own use; in other words, it is the temporary conversion of public funds to officer.

7. SURETIES—*Furnished upon Illegal Agreement.*—If sureties are furnished upon an agreement that the public funds in his possession shall be loaned for his use and they are afterward so loaned, the offense is complete whether they draw interest or not.

8. SAME—*Agreement Must be Previous to the Execution of the Bond.* —If there is no agreement, express or implied, that public money shall be loaned by the officer and interest paid to him for its use, before the sureties sign the bond, the fact that it is afterward so loaned and interest paid can not relate back to the time of signing the bond so as to taint that contract with illegality.

9. WITNESS—*Party Offering Represents Him as Worthy of Belief.*— Where a party offers a witness in proof of his cause he thereby in general represents him as worthy of belief. He is presumed to know the character of the witness, and having thus presented him to the court, the law will not permit him to impeach his general reputation for truth, or impair his credibility by general evidence tending to show him unworthy of belief.

**Administration of Estates.**—Petition to have a claim reclassified. Trial in the Circuit Court of Clinton County; the Hon. SAMUEL L. DWIGHT, Judge, presiding. Finding and judgment for defendants; appeal by petitioners. Heard in this court at the August term, 1898. Affirmed. Mr. Justice CREIGHTON dissenting. Opinion filed March 10, 1899.

M. P. MURRAY, attorney for appellant.

The giving of the bond was a necessary constituent in the plan to procure the public money for private use. All the obligors in the very act of making the bond were engaged in this design. The obligation was good as between them and the State, but while creating between them the relation of principal and surety, it continued the relation already assumed by them of violators of public law. And

in such case, as between the violators themselves, it is the policy of the law to refuse its aid; no matter what the equities may be, it says to them, "For your iniquity you shall not have your equity." The law will not enforce any contract having an immoral or unlawful consideration, and will refuse its aid in the redress of any rights growing out of an attempt, whether successful or not, to debauch its offices or corrupt its officers. Greenhood on Public Policy, rules 202, 203, 204, 274, 279, 283, 290, 293, 295, 300, 302.

Where a right or a contract grows immediately out of and is connected with an illegal or immoral act, or if it be in part only connected with an illegal transaction and grow immediately out of it, and though it be in fact a new contract, a court of justice will not lend its aid to enforce it.

The policy of the law will not permit a party to enforce a promise or a right which has been obtained by an illegal act, although he may connect with this act or promise another which is legal. Nash v. Monheimer, 20 Ill. 215; Henderson v. Palmer, 71 Ill. 579.

Where the scheme is accomplished, its design may be shown by the acts done. A formal agreement or given set of words need not be proved. It is sufficient if the evidence taken as a whole proves an unlawful design. Smith v. The People, 25 Ill. 17; Cole v. The People, 84 Ill. 216; Heaps v. Dunham, 95 Ill. 586; Thomas v. The People, 113 Ill. 534; Spies v. The People, 122 Ill. 100.

R. C. LAMBE, R. L. TATHAM and HOYNE, FOLLANSBEE & O'CONNOR, VAN HOORBEKE, FORD, McGAFFIGAN, KINGSBURY JOHN G. IRWIN and JOHN P. WILSON, attorneys for appellees.

Appellees' case comes within the principle laid down in the case of the Minnesota Lumber Company v. Whitebreast Coal Company, 56 Ill. App. 248, in which the court said:

"Although there may be some illegal feature indirectly connected with a transaction involved in a suit, yet the plaintiff may recover if his cause of action is otherwise legitimate, and he can make out his case without calling to his aid the illegal agreement. The test of whether the demand can be enforced at law is whether the plaintiff

requires the aid of the illegal contract to establish his case. Armstrong v. American Exchange Bank, 133 U. S. 434; Thomas v. Brady, 10 Pa. St. 164; Holt v. Green, 73 Pa..St. 198; Spring Co. v. Knowlton, 103 U. S. 49; Welsh v. Wisson, 6 Gray, 506; Mosher v. Griffin et al., 51 Ill. 184."

Sureties on a bond who are compelled to make good a deficit thereon, are entitled to be subrogated in equity to all of the rights of the obligees against the principal on such bond or against his estate, including the obligee's right to a preference against said principal's estate.    Foss v. City of Chicago, 34 Ill. 488; Hough v. Ætna Life Ins. Co., 57 Ill. 318; Jacques et al. v. Fackney et al., 64 Ill. 87; Richeson et al. v. Crawford et al., 94 Ill. 165; Beaver v. Slanker, Adm'r, 94 Ill. 175; Fogarty et al. v. Ream et al., 100 Ill. 366; Crawford et al. v. Richeson et al., 101 Ill. 351; Lochenmeyer et al. v. Fogarty et al., 112 Ill. 572; Hook v. Richeson et al., 115 Ill. 431; Sheldon on Subrogation, Secs. 87, 88; Dias v. Borchard, 2 Edw. Ch. *435; City of Keokuk v. Love et al., 31 Iowa, 119; Am. & Eng. Ency. of Law, Vol. 24, p. 220, etc.; Regina v. Salter, 1 Hurls. & Norm. 274.

A contract may be illegal because an offense is contemplated as its ulterior result, or because it invites to the commission of a crime.    Am. & Eng. Enc. of L., Vol. 3, 870; L. R. 5 C. P. D. 307; Poplett v. Stockdale, 1 R. & M. 337.

An agreement to carry out some object not in itself unlawful, by means of a breach of contract or breach of trust, is unlawful and void.    Am. & Eng. Enc. of L., Vol. 3, 870; Fuller v. Dame, 18 Pick. 472; Rice v. Wood, 113 Mass. 133 ; Spinks v. Davis, 32 Miss. 152; Jackson v. Ludeling, 21 Wall. 616 ; Oscanyan v. W. Arms Co., 103 U. S. 261 ; Foote v. Emerson, 10 Vt. 338 ; Guernsey v. Cook, 120 Mass. 501; Noel v. Drake, 28 Kan. 265 ; Woodworth v. Wentworth, 133 Mass. 309 ; Hunter v. Nolf, 71 Penn. St. 282.

An agreement, the object of which is to induce any officer of the State to act partially or corruptly, is void.    Am. & Eng. Enc. of L., Vol. 3, 877; Lucas v. Allen, 80 Ky. 681.

Mr. Justice Worthington delivered the opinion of the court.

Appellees, as bondsmen of Rufus N. Ramsey, late State

treasurer, filed a claim against his estate in the County Court of Clinton County, on account of money paid by them to make up his deficit as State treasurer. The case was appealed from the County Court to the Circuit Court, and from that court was appealed by the present appellees to this court. It was heard by our predecessors, and reversed and remanded. Upon a rehearing by the court, as now constituted, the decision rendered was adhered to, Judge Creighton dissenting.

The case is reported as Whitbeck v. Estate of Ramsey, 74 Ill. App. 524, to which reference is made for a fuller statement. The amount of the claim of appellees is $363,948.41. Upon the former hearing in this court it was held that appellees should be charged with $11,591.11, this amount being made up of $8,674.44 interest collected by them on evidences of indebtedness of different parties, found in the treasury vaults and turned over to them, and of $2,916.67 back salary due Ramsey. Appellees insist that they should not be charged with the interest collected, claiming that it belongs to the State. As there is nothing to indicate that the State makes any claims to it, and as appellees admit having received it, we adhere to our former conclusion, and hold that appellees' claim should be reduced to this extent. The case having been remanded to the Circuit Court of Clinton County, the claim of appellees was allowed for $351,948.41 and classed as a sixth class claim.

From this judgment and classification, appellant appeals.

The position of appellant, as stated in his brief, is as follows:

" The estate and the general creditors contest the claim as to the amount, and the classification thereof, in any event; and the latter especially urge the point, that, by reason of an unlawful consideration moving to the claimants for becoming sureties upon the bond, the whole transaction as between the principal and the sureties was vitiated, and that in consequence the claimants have no rights to the premises which the law will recognize and enforce. The unlawful matter alleged is that the claimants, ten in number, representing and in the interest of five banks of the city of Chicago, became sureties upon the official bond

of the treasurer with and because of an agreement that the treasurer should loan to said banks a large amount of the State funds upon which the banks were to allow and pay him interest at the rate of two and one-half per cent per annum on monthly balances, and that pursuant to such agreement the sum of over $1,500,000 of the public money was loaned to said banks very soon after the treasury passed into the hands of the said Ramsey; and that while the amount was reduced from time to time, large and about equal sums constantly remained in said banks until Ramsey's death, and that the stipulated interest was regularly paid to him according to said agreement.

Such use of the public funds was a criminal offense on the part of the treasurer, and severely punishable by fine and imprisonment. Sec. 81, 36 R. S."

The section above referred to reads:

"If any State, county, township, city, town, village or other officer elected or appointed under the Constitution or laws of this State, master in chancery, commissioner, or other officer of any court, or any clerk, agent, servant or employe of any such officer, shall use, by way of investment or loan for his use, except as authorized by law, with or without interest, any portion of the moneys, bonds, mortgages, coupons, bank bills, notes, warrants, orders or other funds and securities intrusted to him for safe keeping, disbursement, transfer or other purpose, if the sum or value of the property so used does not exceed $100, he shall be fined not exceeding $200 or confined in the county jail not exceeding three months, or both; or if the sum or value of the property so loaned or used exceeds $100 he shall be fined in double amount so used or loaned, or confined in the county jail not exceeding one year, or both."

It is not denied by appellees that money was deposited by Ramsey in certain Chicago banks, but they do deny that they signed his bond with and because of any agreement whatever that he should loan money, with or without interest, either to them or to the banks with which they were connected.

Relying upon the doctrine, "*ex turpi causa non oritur actio*," appellant insists, although the bondsmen as sureties of Ramsey may have paid to the State the amount claimed, that they can not enforce the collection of any claim on account of such payment against Ramsey's estate. It is a

broad proposition, and if true, would prevent a recovery against the estate, although by some freak of fortune its assets might turn out to be ten times its liabilities.

The charge is that an unlawful agreement was made by Ramsey and his bondsmen that Ramsey should deposit State money in five certain banks upon which they were to pay him interest, and that in consideration of this agreement, appellees signed his bond; that this was a conspiracy to violate a criminal law, and so tainted the execution of the bond as to bar appellees from recovering any losses whatever sustained by them as bondsmen, upon the implied promise of Ramsey to reimburse them growing out of the execution of the bond.

The defense to the allowance, then, of any claim against the estate, is based upon the charge of a criminal act or acts on the part of appellees. When such a defense is made in a civil action, the evidence to sustain it must be full, clear and satisfactory. McConnell v. Del. Ins. Co., 18 Ill. 233; Germania Fire Ins. Co. v. Klewer, 129 Ill. 612; Riggs v. Powell, 46 Ill. App. 79; 142 Ill. 459; Grimes v. Hilliary, 150 Ill. 146.

Is the charge made by appellant sustained by evidence of this character and to this extent? This is the first question to be considered. In passing upon this case in Whitbeck v. Ramsey, 74 Ill. App. 536, referred to, *supra*, this court said:

" Without reviewing the evidence here, it is considered it fairly shows that the banks had an arrangement with Ramsey to secure the deposit with them of a large amount of the public funds, for which they were to pay him therefor the rate of interest stated, and that because of such arrangement said banks secured for Ramsey said sureties."

As the banks are corporations and can act only through agents, the word " banks " as used in the opinion cited, must refer to persons who acted for and represented the banks.

If this case was before us now upon the identical evidence presented in the former record, the conclusion then reached upon the issue of an unlawful agreement antecedent to the execution of the bond, would be *res adjudicata*. But such

is not the present status of the case.   When tried before
the Circuit Court, to which the case was remanded, addi-
tional testimony of a material character was introduced by
appellant.   It is now before us upon the evidence contained
in the former bill of exceptions, admitted by consent of
parties as evidence in the present hearing, together with
the additional testimony taken since the former hearing.
In view of this additional testimony, it is proper that the
section of the statute above cited should be examined, and
the evidence as now presented should be reviewed with
reference to the specific charge that an unlawful agreement
to violate this statute existed before and at the time of the
execution of bond.

It will be seen by an examination of the statute, that it
is sweeping in the number and grades of persons subject to
its provisions.   It includes State, county, township, city,
town, village or other officers elected or appointed; masters
in chancery, commissioners or other officers of court,
together with clerks, agents, servants or employes of any
such officers.   The offense specified is the use (by the
officer), by way of investment, or the loan for his own use,
with or without interest, etc.   The offense is purely statutory,
and the statute, being a criminal statute, must be strictly
construed.   The statute does not prohibit depositing public
funds in a bank for safe keeping, nor does it prohibit the
bank from using the funds when they have been so depos-
ited.   Nor does it prohibit the agents of a bank from
becoming sureties on an official bond upon condition that
the funds received by the officer shall be deposited in the
banks of which they are agents.

In construing statutes courts apply the meaning of words
as generally used, unless it is apparent that they are used
technically, and take notice of general methods of business,
upon the presumption that legislators, when making laws,
act with reference to such meanings and such methods.

To loan, according to Webster, is " to deliver to another
for temporary use, on condition that the thing be returned ;
or to deliver for temporary use on condition that an equiv-
alent in kind shall be returned with a compensation for its

use." He defines a deposit "as that which is placed any-where for safe keeping, especially a sum of money left with a bank or broker, subject to order."

The American Encyclopedic Dictionary defines a deposit as "money lodged in a bank for safe keeping. Strictly speaking a deposit signifies only bonds or bills, or bullion deposited with a bank at interest and not capable of being withdrawn except after certain specified notice," and refers to a deposit account, which it defines as "money deposited with a banker at interest for some certain specified time. It is opposed to a current account, which can be added to or drawn upon at any time without notice to the banker."

Money deposited upon a deposit account as thus defined, would be a loan, as the word "loan" is used in the statute. And if so deposited by an officer for his own use, with or without interest, would be a violation of the statute. But money deposited by an officer for safe keeping, and not for any definite length of time, and not for his own use and subject to be withdrawn at any time, would not be a loan as the word "loan" is used in the statute. We think that this is the true construction, and that it is so understood by the general public. If it is not, many worthy citizens, in all parts of the State, are unconscious but habitual law-breakers. A large proportion of those included in the statute, who receive and disburse public money, have no safe appliances for keeping it. They deposit public funds in banks solely for safe keeping. If they did not do so, in case of loss by fire, robbery or burglary, they would be justly charged with culpable negligence. Nor can this statute have a special construction that will make criminal the act of one officer when a similar act of another officer would not be criminal. It is general in its application. If a town collector, a city treasurer, a supervisor, a highway commissioner, a superintendent of schools or a master in chancery can deposit money for safe keeping in a bank, without violating the statute in question in this action, a State treasurer can do so.

That banks receiving deposits from officers should furnish the sureties on such officers' bonds, is a natural and not an

unlawful business transaction. And that they should condition their becoming sureties upon an agreement that their banks should be depositories of the funds which they secure, is equally natural and not unlawful. It is not prohibited by statute nor by the common law. That such arrangements prevail generally throughout the States are matters of common knowledge to all conversant with official transactions. The test of criminality then is not the agreement by the officer to deposit public funds for safe keeping at a place designated by his sureties from which they can be withdrawn in whole or in part at any time without notice; but the test is, the investment or the loaning of public funds for his own use; in other words, it is the temporary converson of public funds to his own use. If sureties are furnished upon an agreement that public funds shall be loaned for his use and they are afterward loaned, then the offense is complete whether they draw interest or not. It follows then, that receiving interest is not a necessary element of the criminal act, but is a circumstance tending to show that the payment of interest is consequent upon an agreement made with the officer for a loan upon which interest was to be paid.

It is apparent, too, that if there is no agreement, express or implied, that money shall be loaned by the officer and interest paid to him for its use before the sureties sign the bond, that the fact that it is afterward so loaned and interest paid can not relate back to the time of signing the bond so as to taint that contract with illegality.

The moneys first deposited with the Chicago banks were receipted for by certificates of deposit. The certificate of deposit introduced in evidence is as follows:

"THE CHICAGO NATIONAL BANK.

No. 16966. CHICAGO, January 12, 1893.

F. M. Blount, Ass't Cashier, has deposited in this bank two hundred and fifty thousand dollars payable to his order on the return of this certificate.

F. M. BLOUNT, Cashier.

(On margin) C. L. DAY, Teller.

(Indorsed on back) Pay Chicago Nat. Bank.

F. M. BLOUNT, Cashier.

Credit of R. N. RAMSEY, State Treasurer."

Like amounts were deposited at the same time in four other Chicago banks. In the absence of proof the presumption is that the other certificates were similar to this. It does not appear from the certificate that any notice of withdrawal had to be given, and there is no evidence to show that such notice was required. So far as the certificate discloses, it was a deposit pure and simple, as distinguished from a loan, and liable to be withdrawn wholly or in part at Ramsey's option.

It appears from the evidence that these certificates represented amounts for which Wilson, the former State treasurer, held certificates in the same banks, and that they were received by Ramsey from Wilson as State funds, and upon presentation, were changed so as to represent these funds to his credit as treasurer.

As there is no claim that the funds deposited by Ramsey were loaned for any other use inuring to Ramsey, except the use of producing interest for his benefit, it follows, if we are right in our construction of the statute, that if an illegal contract was made it must have been an agreement, express or implied, that appellees would become his sureties on condition of his loaning moneys upon interest to the banks which they represented. In other words, as interest is the only "use" of the deposit which Ramsey is claimed to have had, the agreement to loan by Ramsey and to pay interest by the banks must have existed at the time of the execution of the bond, in order to taint its execution with criminality. It is not enough that such an agreement may be suspected, or that in the order of events it may seem to have been probable. A crime is alleged—a conspiracy of ten men with one man to deliberately violate, for money, a criminal statute; and this alleged criminal act is pleaded as a bar to a claim of $351,948.41, which otherwise is not contested. Such an agreement, as a defense, must be proved by full and satisfactory evidence, keeping in view the presumption that appellees are innocent rather than guilty.

The evidence to sustain this charge of criminality, from

which this court at a former hearing drew its conclusion, was mainly, if not entirely, circumstantial. It may be briefly summarized as follows:

That the ten sureties on Ramsey's bond were either officers or were in some way connected with five banks in Chicago, each one of which, immediately after Ramsey qualified as treasurer, received a large deposit from him of State funds, and continued to hold large deposits during his life, upon which they paid interest to his order at the rate of two and one half per cent.

That the deposits were made originally by surrendering certificates of deposit held by Wilson, the former State treasurer, and receiving certificates in equal amounts in their place. The certificates were not issued to Ramsey, but to some representative of the bank, and by him indorsed and delivered to Ramsey.

That the respective banks have paid to appellees respectively connected with them the amounts which they paid as sureties to make good Ramsey's deficit to the State.

In addition to these circumstances was the fact that certain witnesses, officers of these banks and sureties on the bond, whose testimony was taken by deposition in behalf of appellant and presented at the former hearing of this case, refused to answer questions touching an agreement with Ramsey before signing the bond, as to whether money was to be deposited in their banks and interest paid on the deposit as the consideration for their becoming his bondsmen.

No effort seems to have been made to compel answers and no reason given for refusing to answer except the advice of counsel.

The witnesses refusing to answer were John R. Walsh, president, and Carl Moll, cashier, of the Chicago National Bank; Elbridge G. Keith, president, and Harvey H. Hitchcock, cashier, of the Metropolitan National Bank; John A. King, president of the Fort Dearborn National Bank, and Charles L. Hutchinson, who gives his business as banker.

The witness John H. Whitbeck testified (Abst. 74): " I

am, or was, on his bond; I offered to become surety on his bond in connection with the bank; no consideration or inducement whatever was held out to me to become such surety."

The refusal of the witnesses above named, parties to the cause, to answer questions directly touching the matter at issue, warranted this court at the former hearing in presuming that they did not answer because their answers, if truthfully given, would have prejudiced their side of the issue. It was a circumstance, taken in connection with other circumstances in evidence, strongly tending to prove the charge preferred against them.

In the hearing before the Circuit Court upon the remanding order from this court, appellant again called John R. Walsh and John A. King as witnesses in his behalf. He was not concluded from controverting their testimony if he was surprised at what they testified. He did not contradict their testimony after it was given. So far as it is affected by other evidence; then, it is only affected by the circumstances in evidence. Appellant, in calling them, represents them as worthy of belief.

"When a party offers a witness in proof of his cause he thereby in general represents him as worthy of belief. He is presumed to know the character of the witnesses he adduces, and having thus represented them to the court, the law will not permit the party afterward to impeach their general reputation for truth, or impair their credibility by general evidence tending to show them to be unworthy of belief." Greenleaf on Evidence, Vol. 1, Sec. 442; Tobin v. Chicago City Railway Co., 17 Ill. App. 84.

Ramsey's bond was executed December 20, 1892, approved by the governor and justices of the Supreme Court and filed January 3, 1893. At some time between the 8th of November, when Ramsey was elected, and the date of the execution of his bond, conversation took place between the witnesses King and Ramsey with reference to making a bond. According to the testimony of King, who procured the sureties on the bond,

"Ramsey said to me the question was whether he should

Estate of Rufus N. Ramsey v. Whitbeck.

make his bond in Chicago or down here; at Springfield, I suppose he meant. I think I offered to make the bond; suggested the ten men that went on the bond. The question came up like that; the question was whether he should make the bond in Chicago or Springfield or the southern part of the State; I suppose he meant Springfield."

Q. Will you state to the court what brought you together in reference to the bond? A. It was many years before that. I don't remember. I was trying to think when I first met him. He was a Democrat and so was I. We were together many times. The first that was said about the bond that I remember he made the question whether he should make it in Chicago or in Springfield, or in the southern part of the State. I supposed all the time he meant Springfield. I offered to make the bond.

Q. What was your proposition or offer to make the bond? A. I don't know anything more than that. The idea was where the bond should be made, whether in Chicago or in Springfield, and I offered to try to make the bond."

King further testifies in substance:

" Nearly the same men were on Wilson's bond. When I said I would make the bond don't think Ramsey made any reply; don't think he decided until after he came home, and he either came back, or sent me a blank bond. The ten bondsmen were directors in five banks divided up, officers or something. I think I took the bond to a part of the signers or sent it by a messenger; don't think I conferred with them before sending messenger; don't think I took it to all of them. Presume I sent a request. I think I went to two places, and I think one or two came to me and asked if I was going to make the bond, and I said I thought I was. There wasn't any talk about it. You ask a man to sign a bond; he either will or won't. Those I asked told me they would sign it; they represented five banks. Two would represent a bank. Our bank had $350,000, that I supposed belonged to the State. My remembrance is the other banks had the same as the Fort Dearborn. I took to the Metropolitan Bank, the same day I received them from Ramsey, two certificates of deposit payable to F. G. Keith, amounting to $350,000. Ramsey handed to me the two certificates of the Fort Dearborn Bank about the 12th of January, 1893, amounting to $350,000. They were payable to my order and indorsed by me. He asked me to change the dates to that day and give them back to him. Instead of chang-

ing the dates I made two new certificates exactly the same, dated that day, and handed them to him. At the Metropolitan Bank it was the same way; I handed them two certificates and asked Mr. Keith to change the dates, which he did and handed them back. I think they were for the same amounts. The same transaction was gone through at the other banks. I suppose the certificates represented State money; they were payable to me and indorsed to Wilson. We had that amount of money from Wilson, the former treasurer, and the certificates Ramsey brought were the same certificates.

Q.   What was said and done with reference to this money and the bond?   A.   I have answered you that Ramsey took these certificates out of his pocket and asked me to change their dates; I told you about going to the Metropolitan; I think I answered all; he did not say anything more except how do you do, which I don't suppose you care for.

. Q.   You say that was all that was said between you?   A. Yes, sir, about the certificates or anything pertaining to that money at that time.   *   *   *

Q.   You have stated all the conversation between you and Ramsey?   A.   Well, at that time.

Q.   Anything else? that was the first interview you had with him after he was inducted into office?   A.   Yes, I saw him once or twice after election and before the time of his taking office.   *   *   *   Nothing was said about business. We talked politics.

Q.   When did you talk about executing the bond?   A. When we was up there, as I told you before, the question was, where should it be made? I made the proposition that I would make it for him.

Q.   Have you told all the conversation that had taken place between you with reference to the execution of the bond or getting State money?   A.   Nothing said about getting State money. I have not spoken about it.

Q.   I mean before the execution of the bond?   A.   I don't believe Ramsey spoke the words; I don't think he said a word about State money.

Q.   What did you say to him?   A.   Not a word.

Q.   Not a word?   No, sir.

Q.   Nothing said between you either way?   A.   No, sir.

Q.   You had State money on deposit from Wilson?   A. Yes, sir, $350,000; and I suppose the other banks had the same.

Q.   And you made the arrangements to get the certifi-

cates changed? A. No arrangement about it; I handed them in and told them to have dates changed and certificates of that day. (Witness describes certificates.) They were made payable, as they had been, to some of the bondsmen—some officer of the bank—with one exception. The idea was to have them as they were when he asked to have the dates changed.

Q. I want to know what was said or done after you changed the certificates as to dates? A. Ramsey said to pay over any interest that came into my hands to his brother if he came in, or to credit it to his bank at Carlisle, which kept an account with our bank. Interest was sent in to me from the other banks once a month; when his brother came in I turned it over to him; if he did not, I credited it to his Carlisle bank.

Q. How did you come to pay interest on these certificates? by what arrangement you paid interest when they didn't draw any, and you had no conversation with Ramsey? A. Ramsey said, as I answered before, if there was any interest sent due him, to pay it to his brother or give his bank credit for it. There was no other arrangement made. Think the rate was two and one-half per cent.

Q. I want to know what was said between you and Ramsey with reference to interest if your certificates did not bear interest? A. I have answered that twice; he said if there was any interest due him, or sent to him, to pay it to his brother or credit it to his bank.

Q. Had you agreed to pay two and one-half per cent interest? A. No, sir.

Q. What amount had you agreed to pay? A. Had not agreed to pay anything.

Q. How did you come to pay it? A. I told the cashier to draw the check.

Q. Yet you had not agreed to pay interest? A. No, sir.

Q. And yet you drew it from month to month and collected it from the other banks? A. Yes, sir, not all the time, sometimes the other banks paid it to Dr. Ramsey.

Q. Will you tell me how they understood what amount of interest they had to pay? A. I am not quite sure, but I think I told them.

Q. How did you know what the rate was? A. I thought that was about right, I reckon.

Q. Did Ramsey think it was right too? A. He never found any fault.

Q. Now, before Ramsey's election, or after his election, was anything said between you, if he was elected or after he was elected, about the rate of interest? A. *Before his election I don't think a word;* I did not go to sleep more than three or four hours in the twenty-four; I was with him, and when he gave out I would take him to the hotel and care for him; did not have a thought for the money, the idea was to win. *After the election there was nothing said about any deposit, or any money or interest, until after he was in office and exchanged these certificates.* He said if there was any interest due him, or was any sent in, that I should deposit it to the credit of the bank at Carlisle or give it to his brother if he came in.

Q. I want to know from you, Mr. King, whether there was any understanding between you and the other bondsmen as to what rate of interest you would pay for the use of the State money? A. There was no understanding between myself and the other bondsmen as to what rate of interest we should pay for State money. Anything that I said about interest to any of them I said it to whoever exchanged the certificates, and sent checks in for interest. I told them two and one-half per cent, if that was the rate. *I don't know whether Ramsey expected it or not. There was no talk between him and me that it should be two and one-half per cent,* nor that I would demand that amount from the other banks; I did that myself, and fixed the rate myself. I don't know what the sureties had to do with it. I didn't talk with them.

Q. What consideration, Mr. King, was there for you to sign a bond for $500,000, as surety for the State treasurer? A. I thought a great deal of Mr. Ramsey, and he and I were warm friends. I would have been glad to have signed a bond with one security with me, and shouldn't have said a word about my pay in any way whatever. Personally he was a warm friend of mine.

Q. That was so of all the sureties was it? A. No, I think the others went on because I asked them; I told you I went to two or three of them.

Q. What expectation was there on the part of the sureties to get this State money · from anything you may have said to them as the representative of Mr. Ramsey? A. Mr. Ramsey didn't say a word about it in any way whatever.

Q. You represented Mr. Ramsey in getting this bond? A. I don't think so; I went to people I knew. We were making a bond for Mr. Ramsey. There was not the least

representation made in any way whatever that State money would remain in the banks."

Witness further testified : " I don't know of any common understanding between these banks that they would pay interest. I know what I told whoever exchanged the certificates for me. There was no understanding except I said to them, ' Send your check for the interest to me on the first day of every month.' This statement was made to whoever I handed the certificates.

Q. Now the same mode of business that commenced at the beginning of Ramsey's administration continued throughout it ? A. I think some of the banks, I wouldn't say how many, stopped sending me checks. Don't know whether his brother collected it. We did not stop paying interest as long as he lived.

Q. Who was behind the bondsmen in this matter ? A. I will answer from hearsay. I was told there was somebody behind one of the bondsmen; that one had an indemnifying bond. Our bank did not stand behind us. John H. Whitbeck and I each paid $40,000. The next April the bank assumed it. Never heard whether the other banks did the same or not."

John R. Walsh testified in substance :

" I signed Ramsey's bond at the request of John A. King. The substance of the conversation with King was, he wanted to make Ramsey's bond in Chicago, and wanted me to sign it and get some one else of our people to sign it. I selected McNally, a director in our bank. This was a week or two before signing bond. Had no arrangement with Ramsey touching the use of money deposited in our bank. The bank paid interest at the rate of $2\frac{1}{2}$ per cent, I think. We often pay interest when there is no engagement. It is a common thing to pay interest on time and demand deposits. Deposits are often made without any understanding as to interest both on certificates and on pass books. We pay when we can not help it, or where policy demands. If we want the money to stay and can keep it by paying interest we pay it. What we do is governed by the size of the deposit, and whether we can use the money. We paid $2\frac{1}{2}$ per cent on money deposited by Ramsey because we had the mistaken notion that we could make some profit out of it. There was no contract to pay interest on it. I suppose if we had not paid it might have gone away. Paid interest on current account. The current account was in the name of Ramsey, State Treasurer. Don't know why

the certificate was not put in Ramsey's name. King got the interest paid on that certificate. The reason we did not make the certificate bear interest is we don't ever put any interest on demand certificates. We determine whether we will pay interest on them by the number of days we have the money. (Witness shown the certificate.) The money was put to Ramsey's credit on our books. The stamp on the back 'Chicago National Bank, Oct. 10th, 1893,' shows when it was paid, that is, deposited to current account. When I went on that bond I had no assurance from anybody that we would get the use of the State money in doing so. We did not talk about such things; would not be likely to; nothing said on that subject.

Q. Was something understood? A. Might have been.

Q. Will you give us the understanding? A. I did not have much understanding about it.

Q. You knew if the money was deposited you would have to pay interest on it? A. Yes, sir.

Q. Do you think that money represented by the certificate went to the account current? A. I am sure it did; that is what this paper shows. Interest was paid on certificate at 2½ per cent.

Q. *I want you to state frankly* under what understanding it was you paid interest on that certificate and on the account current? A. *No understanding at all.*

Q. Do you know whether there was an understanding or not? A. *No, sir, no understanding.* I have already testified to that. There might have been, but there was not.

(Witness identifies original certificate for State money while Ramsey was treasurer, and amounts of interest paid and to whom paid.)

I paid one-tenth of deficit by check on my individual account and McNally paid one-tenth. The bank paid it back five or six months afterward. There was no understanding when we signed bond that bank would reimburse. Don't usually contemplate a loss when signing a bond. When I paid the loss I believed the bank would pay it back. If there was a profit, the shareholders would get it, and if there was a loss they ought to share it."

*Cross-examination.*

"Nothing was said between Ramsey or the bank, or any one acting for him before that time, about our bank or the bondsmen paying interest on Ramsey's deposits."

While these two witnesses, King and Walsh, are parties

in interest, we are not prepared to say, from an examination of their testimony, as given in full in the record, that they have not testified fairly, candidly and truthfully. While called by appellant, the manner of their examination by his attorneys was that of a cross-examination, and was full and searching. If their testimony is true, there was no agreement prior to the execution of the bond, either as to deposits or interest. King procured the signers to the bond, and so far as the evidence discloses, is the only surety who had any talk with Ramsey in reference to it. He testifies positively that the first reference to interest was after Ramsey had been inducted into office, January 3, 1893, while the bond was executed December 20, 1892. The testimony of King also is to the effect that the execution of the bond was not conditioned upon the deposit of State funds. In this he is corroborated, to the extent of their knowledge, by two other bondsmen, Whitbeck and Walsh. The latter witness expressly states that he had no assurance from anybody that he would get the use of State money, and that there was no agreement of his bank to pay interest, and explains why interest is paid upon a current account, or a demand certificate, when there has been no agreement to pay interest, viz., to keep the deposit from being withdrawn. Whatever agreement, if any, made after the execution of the bond, or whatever understanding amounting to an implied agreement that may have occurred after that time, can not relate back so as to taint with illegality the execution of the bond. It is evident that Wilson, the former treasurer, at the time he was succeeded by Ramsey, had State moneys deposited in Chicago, and that the certificates which Ramsey presented in January represented this money. It is very probable that the personal interest his friend and political associate, King, took in providing his bond, was quickened by a desire to have these deposits remain in Chicago. It is quite as probable that King and the other sureties may have expected that by furnishing a bond these deposits would so remain; and that in order to keep these in their banks they would have to pay interest

on them. This desire and expectation may have been the motives for their actions. But a motive is not necessarily a consideration.

It is said in Philpot v. Granger, 16 Wall. (U. S.) 577:

" It is, however, not to be doubted that there is a clear distinction sometimes between the motive that may induce to entering into a contract and the consideration of a contract. Nothing is consideration .that is not regarded as such by both parties. It is the price voluntarily paid for a promisor's undertaking. An expectation of results often leads to the formation of a contract, but neither the expectation nor the result is the cause or meritorious occasion requiring a mutual recompense in fact or in law."

If King's testimony is true in reference to his procurement of bondsmen, that there was not the least representation made in any way whatever that the State moneys would remain in the banks, the action of the bondsmen in becoming sureties, must have been prompted, by a motive rather than by a consideration, by expectation rather than by agreement. Viewed in this light, the circumstances, apparently criminating and made more so by the refusal to testify of witnesses knowing the facts, lose much of their probative force when the witnesses do testify denying criminality, and explaining their alleged criminal action upon a reasonable hypothesis of innocence. Weighing, then, the testimony of King, who, so far as the testimony discloses, is the only living witness to what took place between him and Ramsey, and who alone procured the sureties on the bond, and who alone knows what was said and done in reference thereto, and the testimony of Walsh, given definitely and positively, and so far as it goes, corroborating King, we are not prepared to say that ten men holding honorable and responsible positions in business and society have been proven guilty of a criminal conspiracy by evidence full and satisfactory. They are not guilty if the testimony of Whitbeck, King and Walsh is true.

Having arrived at this conclusion, it is not pertinent to the decision of the case to refer to the arguments of counsel touching the legal effect of an antecedent criminal agreement upon a claim of this character.

The classification of the claim as a sixth-class claim has already been ordered by this court, and we see no reason to change the order.

The judgment of the court is therefore affirmed.

Justice CREIGHTON dissents.